UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JODY T. VIDRINE | CIVIL ACTION |
| VERSUS | NO. 13-40 |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION | SECTION "F" (2) |

# FINDINGS AND RECOMMENDATION

Plaintiff, Jody T. Vidrine, seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Act. 42 U.S.C. §§ 405(g), 423. This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2(B).

As ordered, Vidrine filed a memorandum of facts and law. Record Doc. No. 13. The Commissioner filed a timely reply memorandum. Record Doc. No. 14.

I.  PROCEDURAL HISTORY

Vidrine filed an application for DIB on January 28, 2011, alleging disability since January 1, 2007, due to a heart attack, high blood pressure and a hearing impairment. (Tr. 45, 98, 119). His date last insured for benefits was December 31, 2008. After his application was denied, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on October 17, 2011. (Tr. 23-43). On November 10, 2011, the

ALJ issued a decision denying plaintiff's application for benefits. (Tr. 8-13). After the Appeals Council denied review on November 9, 2012, the ALJ's decision became the final decision of the Commissioner for purposes of this court's review. (Tr. 1-4).

II.  STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the ALJ made the following errors:

A.  The ALJ erred by finding that his impairments were not severe before his date last insured.

B.  The ALJ erred by failing to apply the Medical Vocational Guidelines.

III.  ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following relevant findings:

1.  Vidrine has not engaged in substantial gainful activity during the period from his alleged onset date of January 1, 2007 through his date last insured of December 31, 2008.

2.  During that period, plaintiff had a medically determinable impairment of coronary artery disease, but had no severe impairments.

3.  Vidrine has not been under a disability at any time from January 1, 2007 through his date last insured of December 31, 2008.

(Tr. 23-31).

IV.  ANALYSIS

A.  Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the

Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002); Loza v. Apfel, 219 F.3d 378, 390 (5th Cir. 2000). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Perez, 415 F.3d at 461; Loza, 219 F.3d at 393. This court may not "reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000). The Commissioner, rather than the courts, must resolve conflicts in the evidence. Id.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91 (1992). Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it. Perez, 415 F.3d at 461. Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Id.; Newton, 209 F.3d at 452; Martinez v. Chater, 64 F.3d 172, 173 (5th Cir. 1995).

To be considered disabled and eligible for DIB, plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A). The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability. 20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2010). The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity. Id. §§ 404.1520, 416.920; Perez, 415 F.3d at 461; Waters, 276 F.3d at 716; Loza, 219 F.3d at 393.[1] The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled. Perez, 415 F.3d at 461.

---

[1] The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled. Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence. Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated. If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled. Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy. If the claimant cannot meet the demands, he or she will be found disabled. Id. §§ 404.1520(f)(1), 416.920(f)(1). To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

The claimant has the burden of proof under the first four parts of the inquiry. If he successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing. When the Commissioner shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding. Id.; Newton, 209 F.3d at 453.

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) his age, education, and work history." Martinez, 64 F.3d at 174.

B.   Factual Background

Plaintiff testified that he is 56 years old, married and had completed eleventh grade. He said he obtained a GED four years after leaving high school, but still struggles with reading, spelling and writing.

Vidrine stated that he worked for Cox Cable as a field collector for 20 years. His duties were to knock on the doors of cable customers who had not paid their bills, ask if they would pay and disconnect their cable at the pole if they did not pay. (Tr. 28-30). He said he carried and climbed a 32-foot ladder in this job.

Plaintiff testified that he had also worked at a pool hall that he owns, but that it became too difficult to continue because he had to stand up the entire time and he became

short of breath, so now bartenders handle it. He said he cut back to working two to three days per week, but stopped working completely in late December 2006 or early January 2007.

Vidrine said he had a myocardial infarction in 1995. (Tr. 30). He testified that he stopped working in 2007 because he did not have insurance. He stated that, whenever he became short of breath, he was afraid he would end up in the hospital and his fear of having a heart attack only made it worse. He said he has a lot of anxiety.

Plaintiff testified that he is treated by Dr. Yager because he has problems sleeping, but that the medicine that Dr. Yager prescribes does not work. He said he also takes medication for anxiety, which helps a little bit. (Tr. 31).

Vidrine stated that, as of 2007, he basically did not do much. He testified that he cuts his grass, but gets overheated and has to go indoors for a break. He testified that things that used to take 20 minutes now take an hour or two because he is scared.

Plaintiff said he used to play softball, play in pool tournaments and go bowling, but he cannot engage in these hobbies anymore because he gets short of breath so quickly and "that just ruins it for me because I don't want to have another heart attack." He stated that, when he stopped working, he worked nights at the pool hall and was unable to work more than two or three hours, even though the work involved a lot of sitting. (Tr. 32).

Vidrine testified that, at that time, he could stand for about 20 minutes until his legs became tired and that he could only walk his dogs for about a block before he felt exhausted. He said he starts to worry about getting short of breath if he goes up or down stairs too fast. He stated that, during a typical day in 2007, he laid on the sofa or sat in a lounge chair for two to three hours to stay off his feet, and spent most of the day not doing much of anything. (Tr. 33-34).

Plaintiff said he still owns the pool hall, which has a bar in it. He stated that he used to do everything for the business, including paperwork, until about 2007. (Tr. 34). He testified that his wife now opens the pool hall in the morning, does the ordering and other paperwork and makes sure everything is running properly. (Tr. 34-35). He said he will go to the pool hall if the police call and he has to deal with them, but his wife does everything else. He stated that she has no other job.

Vidrine testified that he quit the cable company because "I didn't want to die out there and at that time I was getting scared that . . . if I work out there another summer and I'm hauling a 32 foot work ladder in people's back yards and jumping fences and all that I just couldn't do it anymore." He said he was told after his heart attack that he had permanent damage to his heart, and he did not want to die on the job. (Tr. 35). He stated that he would like to go back to work, but knows he cannot do the work.

Plaintiff explained that he waited until 2011 to apply for DIB because his condition in "the past couple of years [has] really, really gotten bad" and he gets "a little

7

more sick more often and . . . I would like to get insurance. I can't buy it. Nobody [will] sell it to me so I'm one mess up from being just totally wiped out." (Tr. 36). He testified that the main things that bother him are shortness of breath and the fear "that I could get totally wiped out and not see my grandkids, . . . I just worry."

Vidrine said that Dr. Yager handles everything for him, such as blood work and a recent scare that he might have prostate cancer. He stated that Dr. Marx is his ear doctor. (Tr. 37). He said he had a hard time hearing the judge and that he has to be looking at someone to understand what they are saying. He testified that he will not understand anything if two people are talking at the same time. He said the doctor told him he has selective hearing because he does not hear his wife talking to him. He said Dr. Marx explained that plaintiff is unable to hear some women's voices, particularly in a crowd, such as at a Thanksgiving gathering. Vidrine testified that he has had a hearing problem "[s]ince I was a kid. I worked at the American Can Company 40 years ago and that blew my hearing out." (Tr. 38).

Plaintiff stated that he used to see Dr. Dugan, a cardiologist, but that the tests Dr. Dugan ordered were very expensive. He said his last stress test was about five years ago and Dr. Dugan told him afterwards that he knew he had a bad heart. Vidrine said he is just waiting for it to get worse. He testified that Dr. Dugan's care was preventive and that Dr. Yager now takes care of him, including ordering echocardiograms. He said he has been seeing Dr. Yager every six months for many years. (Tr. 39-40).

In response to a question by the vocational expert, Vidrine testified that he had tended bar at the pool hall. (Tr. 41).

C. <u>Vocational Expert Testimony</u>

Crystal Younger, a vocational expert, testified that plaintiff's past relevant work was unique because it combined the job of a bill collector with that of an installer. She said a bill collector is classified as semiskilled work at the light exertional level, while an installer performs either medium or heavy work, depending on the weight of the ladder. (Tr. 40-41). She stated that the management part of Vidrine's past relevant work at the pool hall was a skilled job, while bartending is semiskilled, and that both aspects of that job are light duty. She testified that he had skills of investigating (from his bill collecting job), finding out information, administering and accommodating that are transferable into sedentary work. (Tr. 41-42).

The ALJ asked Younger to assume a hypothetical individual with plaintiff's age of 51 on the alleged onset date, education and work experience, who is unable to sustain a consistent work schedule for 40 hours per week or is required to take more than the usual breaks throughout the day to lie down. The vocational expert testified that such a person could not maintain employment. (Tr. 41-42).

D. <u>Medical Evidence</u>

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence. (Tr. 12). I find the ALJ's summary of the medical evidence

substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

    E.    <u>Plaintiff's Appeal</u>

        1.    <u>Substantial evidence supports the ALJ's finding that plaintiff's impairments were not severe before his date last insured.</u>

The ALJ found at step two of the sequential evaluation that Vidrine had no severe impairments from the alleged onset date of January 1, 2007 through his date last insured of December 31, 2008. The ALJ stated that the medical evidence of record regarding that time period "is diminutive." Substantial evidence supports these findings.

To prove entitlement to DIB, plaintiff "must not only prove that [he] is disabled, but that [he] became disabled prior to the expiration of [his] insured status." <u>Anthony v. Sullivan</u>, 954 F.2d 289, 295 (5th Cir. 1992) (citing 42 U.S.C. § 423(a), (c)); <u>accord</u> <u>Brunson v. Astrue</u>, 387 F. App'x 459, 460 (5th Cir. 2010); <u>Brown v. Astrue</u>, 344 F. App'x 16, 19 (5th Cir. 2009) (citing <u>Ware v. Schweiker</u>, 651 F.2d 408, 411 (5th Cir. 1981)); <u>Joubert v. Astrue</u>, 287 F. App'x 380, 382 (5th Cir. 2008); 20 C.F.R. §§ 404.315, 404.320, 404.131(a).

"Evidence showing a degeneration of a claimant's condition after the expiration of his Title II insured status is not relevant to the Commissioner's Title II disability analysis." <u>McLendon v. Barnhart</u>, 184 F. App'x 430, 432 (5th Cir. 2006) (citing <u>Torres v. Shalala</u>, 48 F.3d 887, 894 n.12 (5th Cir. 1995)); <u>accord</u> <u>Dominguez v. Astrue</u>, 286 F.

App'x 182, 185 (5th Cir. 2005). A claimant who became disabled after the expiration of his insured status is not entitled to DIB. Id. at 186; Cook v. Astrue, No. 7:07-CV-0170-BF, 2008 WL 4454044, at *6 (N.D. Tex. Oct. 2, 2008) (citing 42 U.S.C. §§ 416(i)(3), 423c; Oldham v. Schweiker, 660 F.2d 1078, 1080 (5th Cir. 1981)). Vidrine therefore must show that he was disabled as of December 31, 2008, the date that he was last insured for DIB.

In the Fifth Circuit, an impairment is considered non-severe if it is "'a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.'" Loza, 219 F.3d at 391 (quoting Stone v. Heckler, 752 F.2d 1099, 1101 (5th Cir. 1985)) (internal quotation omitted). To be disabling, an impairment or combination of impairments must be severe for a continuous period of at least 12 months. 20 C.F.R. §§ 404.1505(a), 404.1509, 404.1520(a)(4)(ii); Barnhart v. Walton, 535 U.S. 212, 217 (2002).

Vidrine had a myocardial infarction in 1995, from which he recovered and returned to work at the cable company. Although he had a medically determinable impairment of coronary artery disease and a diagnosis of hypertension before January 1, 2007, substantial evidence supports the ALJ's finding that Vidrine had no severe impairments from that date through December 31, 2008. He worked at the pool hall until late December 2006. He stated on his disability report dated January 28, 2011 that he

stopped working at the cable company at the end of 2003 "because of other reasons," explaining that "I was afraid that I might have another heart attack and die while out in the field." He said his condition became severe enough to keep him from working on January 1, 2007. (Tr. 119). He stated on his Function Report that he is limited in his ability to work because "I get short winded and scared after starting a task." (Tr. 126). Similarly, plaintiff testified that he stopped working because he was afraid he would have a heart attack and because he did not have insurance. He stated that he did not apply for DIB until 2011 because his condition had only worsened in the past couple of years, which was after the end of his insured period. He admitted that he suffers from anxiety about having a heart attack. (Tr. 31, 36). Thus, the evidence substantially supports a finding that Vidrine stopped working based on his own decision, <u>not</u> because of any physical inability to perform work activities or on the advice of any physician.

The record contains few medical records from the relevant time period. Dr. Alan Yager's progress notes from January 2006 through October 19, 2007 (which are often very difficult to read) include diagnoses of hypertension, coronary artery disease and elevated cholesterol. Dr. Yager generally saw Vidrine every six months for checkups and medication renewals. Plaintiff's blood pressure was under control at each visit. (Tr. 181-85). Vidrine had no significant complaints at his visits to Dr. Yager on February 17, March 14 and September 5, 2006. On the latter date, plaintiff's lungs and chest were clear on physical examination. (Tr. 184-85).

Vidrine saw Dr. Fortune Dugan, the cardiologist who treated him after his heart attack, twice in 2006. The record contains no treatment records from Dr. Dugan between January 21, 2002 (Tr. 222) and February 27, 2006. On both February 27 and March 8, 2006, the checkmarks on preprinted checklists in the progress notes indicate that Vidrine reported no chest pain, shortness of breath, palpations, fainting or dizziness. (Tr. 219-20). To the extent that Dr. Dugan's progress notes are legible, they indicate that plaintiff reported no chest pain on February 27, 2006, but he had experienced an episode of shortness of breath and dizziness that lasted 30 minutes on February 5, 2006. He reported no shortness of breath at any other times. Dr. Dugan noted that plaintiff had no chest pain, no episodes of syncope[2] and no claudication.[3] Physical examination, including plaintiff's blood pressure, was essentially normal. (Tr. 220-21). Dr. Dugan ordered a chest x-ray, which revealed no acute cardiopulmonary disease. (Tr. 291).

On March 8, 2006, plaintiff took a cardiac treadmill test, which Dr. Dugan interpreted. No diagnostic ST segment changes were seen. Dr. Dugan's impressions were: "(1) Negative for ischemia but of reduced sensitivity due to resting ST abnormality. (2) No arrhythmias were present. (3) No chest pain. (4) Average exercise capacity." (Tr. 305-06). A myocardial SPECT (single photon emission computed

---

[2]Syncope is "[l]oss of consciousness and postural tone caused by diminished cerebral blood flow." Stedmans Medical Dictionary (27th ed. 2000), avail. on Westlaw at STEDMANS 396790.

[3]Claudication is "[l]imping, usually referring to intermittent claudication." Intermittent claudication is "a condition caused by ischemia of the muscles; characterized by attacks of lameness and pain, brought on by walking, chiefly in the calf muscles; however, the condition may occur in other muscle groups." Id. at STEDMANS 81880.

tomography) scan the same day showed a small fixed defect with partial reversibility within the anterior lateral wall, which was unchanged since a prior examination on January 21, 2002. The radiologist's impression was stable exam with no new reversible defects. (Tr. 289). The prior examination of January 21, 2002 was compared to an earlier examination on October 22, 1999, and also was essentially unchanged from that earlier study. (Tr. 292).

After reviewing plaintiff's test results, Dr. Dugan prescribed medications to lower his cholesterol and triglyceride levels. He noted that Vidrine had no insurance and "wants no angio now." (Tr. 219). There are no treatment records from Dr. Dugan after March 8, 2006.

On January 3, 2007, Vidrine returned to see Dr. Yager. He complained of a cough, congestion and shortness of breath, but was in no acute distress. He smoked two packs of cigarettes per day. On physical examination, he had distant breath sounds. The diagnosis is unclear, but might be bronchitis. Dr. Yager prescribed an antibiotic and cough medicine. (Tr. 183). No complaints were noted on March 13, 2007. (Tr. 182). On May 11, 2007, plaintiff reported that he "feels OK" and was treated with an antibiotic for a swollen salivary gland. On October 19, 2007, Vidrine reported episodes of shortness of breath for several days. He was very anxious. (Tr. 181).

Plaintiff had a duplex study of both carotid arteries on May 10, 2007, which revealed minimal intimal[4] thickening in the common carotid arteries bilaterally, plaque in the bulbs bilaterally with an estimated stenosis of 30 percent on the left and less than 20 percent on the right, and less than 20 percent in the proximal internal carotid arteries bilaterally. He was assigned a score of 4 out of a possible 5 for intimal medial thickness (IMT), which, according to an "IMT Plaque Classification Chart" included on the test report, indicates the presence of multiple lesions with definite calcified components and that significant coronary artery disease is probable. (Tr. 189-90). This study confirms plaintiff's earlier diagnosis of coronary artery disease.

After the relevant time period ended on December 31, 2008, Dr. Yager's treatment notes from 2009 through 2011 indicate that Vidrine continued to smoke and had continued diagnoses of hypertension, coronary artery disease and high cholesterol. Dr. Yager's progress notes reflect occasional complaints of flu-like symptoms, earaches, problems sleeping due to anxiety and, in January 2011, hearing loss. Plaintiff's blood pressure was controlled with medication. (Tr. 174-80). Dr. Yager diagnosed chronic obstructive pulmonary disease on February 7, 2011. (Tr. 174). A chest x-ray taken on that date revealed no definite active cardiopulmonary disease. (Tr. 208).

---

[4]The intima is "the innermost coat of an organ (as a blood vessel) consisting usually of an endothelial layer backed by connective tissue and elastic tissue." Medline Plus Medical Dictionary, (Merriam-Webster, Inc. 2013), http://www.merriam-webster.com/medlineplus/intima (visited on Oct. 7, 2013).

Vidrine received no treatment for hearing loss until January 10, 2011, when he saw Dr. Herbert Marks. After testing on February 2, 2011, Dr. Marks diagnosed mild to severe signal/noise hearing loss. He recommended that plaintiff take Mucinex and use hearing aids when desired. (Tr. 170-72). There is no record evidence of any complaints of hearing loss before these dates. Vidrine testified that he has had hearing loss "[s]ince I was a kid" (Tr. 38), but he worked full-time for many years after that and there is no evidence that he stopped working or was unable to work in 2007 and 2008 because of any hearing loss.

"The severity of an impairment is measured in terms of its effect on the claimant's ability to work. A mere diagnosis is insufficient to establish that an impairment is severe because it does not reveal the extent to which the impairment limits the claimant's ability to work." Stone v. Astrue, No. 8:12-cv-35-T-17TBM, 2013 WL 1212889, at *6 (M.D. Fla. Feb. 26, 2013), report & recommendation adopted, 2013 WL 1212881 (M.D. Fla. Mar. 25, 2013) (citing Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005)); accord Casares v. Astrue, No. 4:11CV162, 2013 WL 960229, at *6 (S.D. Miss. Feb. 25, 2013), report & recommendation adopted, 2013 WL 960186 (S.D. Miss. Mar. 12, 2013); Morris v. Astrue, No. 4:11-CV-631-Y, 2012 WL 4468185, at *8 (N.D. Tex. Sept. 4, 2012), report & recommendation adopted, 2012 WL 4466144 (N.D. Tex. Sept. 27, 2012) (citing Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1999)); Ranes v. Astrue, No. 3:08-CV-2030-D, 2009 WL 2486037, at *3 (N.D. Tex. Aug. 14, 2009) (citing Randall v. Astrue,

570 F.3d 651, 657-59 (5th Cir. 2009)); Schultz v. Astrue, No. 09-3238, 2010 WL 2733605, at *9 (E.D. La. June 8, 2010), report & recommendation adopted, 2010 WL 2733565 (E.D. La. July 8, 2010).

At step two of the sequential evaluation, "the claimant bears the burden of proving not only that [he] has been diagnosed with a medically determinable impairment but also that it affects [his] ability to work." Morris, 2012 WL 4468185, at *8 (citing Randall, 570 F.3d at 657-59). In the instant case, substantial evidence supports the ALJ's findings that Vidrine's diagnoses of coronary artery disease and hypertension are not severe impairments.

The record demonstrates that plaintiff was able to work for many years after his heart attack and after he was diagnosed with coronary artery disease and hypertension, which were controlled with medication. He did not suffer any cardiac or hypertensive symptoms severe enough to seek treatment other than renewing his medications every six months. The only medically documented incident of symptoms serious enough to send him back to his cardiologist after four years without treatment was an episode of shortness of breath and dizziness that lasted 30 minutes on February 5, 2006. There were no documented serious incidents or complaints after that date. His hearing loss did not bother him enough to complain about or to seek treatment until January 2011, long after expiration of the period when he was insured for DIB.

A claimant's lack of need for medication or failure to seek treatment is a relevant factor to consider in determining the severity of an alleged impairment and may be used in conjunction with the medical reports to discount plaintiff's complaints of disabling pain or other limitations.  Doss v. Barnhart, 137 F. App'x 689, 690 (5th Cir. 2005); Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992); Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991); Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir. 1990).

Vidrine testified that he stopped working because of his anxiety about his health and because he did not have insurance, not because he was medically or functionally unable to work.  He also testified that he did not apply for DIB until January 2011 because his condition had only worsened in the past couple of years, which was after his date last insured.  The medical records substantially support this testimony.

Plaintiff has not satisfied his burden to present substantial evidence that his coronary artery disease and hypertension would be expected to interfere with his ability to work for at least 12 continuous months during the relevant time period of January 1, 2007 through December 31, 2008.  Accordingly, the ALJ's finding that Vidrine had no severe impairment is supported by substantial evidence.

    2.    The ALJ did not err by failing apply the Medical Vocational Guidelines.

Because plaintiff did not carry his burden to establish that he has a severe impairment at step two of the sequential evaluation, the ALJ found him not disabled at that step and did not proceed to any additional steps.  The five-step inquiry terminates

if the Commissioner finds at any step that the claimant is not disabled.  Perez, 415 F.3d at 461.

The Medical Vocational Guidelines become applicable at the fifth step only if it is determined at the second step that the claimant has a severe impairment, at the third step that he does not meet any listing and at the fourth step that he does not have the residual functional capacity to return to his past relevant work.  As explained in the preceding section, the ALJ's conclusions at the second step are supported by substantial evidence and she did not err by concluding at this step that Vidrine was not disabled prior to December 31, 2008.  Accordingly, there was no need for her to proceed to any subsequent steps and no need to consult the Medical Vocational Guidelines.

## CONCLUSION

The ALJ did not err by finding that plaintiff had no severe impairments prior to his date last insured.  The ALJ's findings are supported by substantial evidence.  She appropriately did not proceed to the fifth step of the sequential evaluation, which is the only step at which the Medical Vocational Guidelines apply.

## **RECOMMENDATION**

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's appeal be denied and his complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen

(14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[5]

                         New Orleans, Louisiana, this   9th   day of October, 2013.

                                      JOSEPH C. WILKINSON, JR.
                                UNITED STATES MAGISTRATE JUDGE

---

[5] Douglass referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.